## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HERBERT WEISS, JOHN BENDOKAS, MARIA CACIA, DONALD CURRY, BRIGHTON MANAGEMENT GROUP, LLC, THEODORE KILKUSKIE, ALBERT NEIBERG, GEORGE RYMAR, JOSEPH SCHIRMER, and D.W.M. INCORPORATED., Plaintiffs, | : : : : : : : : : | CIVIL ACTION  No. 2:11-cv-5336-EL |
| v. | : : : | |
| NOVA FINANCIAL HOLDINGS, INC., NOVA BANK, THE KEYSTONE EQUITIES GROUP, BALLAMOR CAPITAL MANAGEMENT, BARRY BEKKEDAM, BRIAN M. HARTLINE, and EDWARD J. DIMARCANTONIO, Defendants. | : : : : : : : : | |

## AMENDED COMPLAINT

Plaintiffs Herbert Weiss, John Bendokas, Maria Cacia, Donald Curry, Brighten Management Group LLC, Theodore Kilkuskie, Albert Neiberg, George Rymer, Joseph Schirmer and D.W.M., Incorporated (collectively the "Plaintiffs"), by and through their undersigned counsel, hereby file this Complaint against Defendants NOVA Financial Holdings, Inc., NOVA Bank, Brian M. Hartline, Edward J. DiMarcantonio Ballamor Capital Management, Barry Bekkedam and the Keystone Equities Group ("Keystone"), and allege as follows:

### PARTIES

1.     Plaintiff Herbert Weiss is an adult individual residing at 7766 Windy Largo Court, Lake Worth, FL 33467.

2.     Plaintiff John Bendokas is an adult individual residing at 25 Island Drive Brick Town, NJ 08724.

3.      Plaintiff Maria Cacia is an adult individual residing at 415 Montgomery Avenue Merion Station, PA 19066.

4.      Plaintiff Donald Curry is an adult individual residing at 56 Harvard Lane Bedford, NH 03110.

5.      Plaintiff Brighten Management Group, LLC is a Pennsylvania limited liability company with a place of business at 250 Manor Avenue, Langhorne, PA 19047.

6.      Plaintiff Theodore Kilkuskie is an adult individual residing at 2211 Yardley Road, Yardley, PA 19067.

7.      Plaintiff Albert Neiberg is an adult individual residing at 499 Waldron Park Drive, Haverford, PA 19041.

8.      Plaintiff George Rymar is an adult individual residing at 3175 Paper Mill Road, Huntingdon Valley, PA 19006.

9.      Plaintiff Joseph Schirmer is an adult individual residing at 813 Ensign Drive, Forked River, NJ 08731.

10.     Plaintiff, D.W.M. Incorporated is a Pennsylvania corporation with a principal place of business at 355 E. Lancaster Avenue, Haverford, PA, 19041.

11.     Defendant NOVA Financial Holdings, Inc. ("NOVA") is a Pennsylvania corporation and a registered bank holding company, having its principal place of business at 1235 Westlakes Drive, Suite 420, Berwyn, PA 19312.

12.     Defendant NOVA Bank ("NOVA Bank") is a Pennsylvania state chartered bank, having its principal place of business at 1235 Westlakes Drive, Suite 420, Berwyn, PA 19312.

13.     Defendant The Keystone Equities Group, L.P. ("Keystone") is a Pennsylvania Limited Partnership and a registered NASD broker-dealer, having its principal place of business

2

at 1003 Egypt Road, Oaks, PA 19456. Keystone acted as placement agent for NOVA.

14. Defendant Ballamor Capital Management ("Ballamor") is a Pennsylvania Corporation and a registered investment advisor, having its principal place of business at 24 Louella Ct, Suite 100, Wayne, PA 19087. Ballamor acted as a stock promoter on behalf of NOVA in 2008-2009.

15. Defendant Barry Bekkedam is an adult individual residing at 7320 SE Medalist Pl., Hobe Sound, FL 33455. Bekkedam was a founding shareholder of NOVA and the former Chairman of the Board of NOVA and the founder, Chairman and Chief Executive Officer of Ballamor. Bekkedam is also the founder and principal of Ballamor. Since the inception of NOVA and specifically in 2008-2009, Bekkedam acted as a stock promoter on behalf of NOVA.

16. Defendant Brian M. Hartline is an adult individual and the founder, President and CEO of NOVA financial and serves as a director of NOVA Financial, residing at 36 Windward Court, Collegeville, PA 19426. Hartline is the President and Chief Executive Officer of NOVA Bank and serves as Chairman of NOVA Bank's Board of Directors. Hartline acted as a stock promoter on behalf of NOVA in 2008-2009.

17. Defendant Edward J. DiMarcantonio is an adult individual and the Chairman of the Board of Directors of NOVA, residing at 528 Arbordale Road, Wayne, PA 19087.

<u>JURISDICTION AND VENUE</u>

18. This case was commenced via a writ of summons that was filed in the Philadelphia Court of Common Pleas on June 20, 2011.

19. On August 31, 2011, Defendants removed the case to the United States District Court for the Eastern District of Pennsylvania.

20. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, and under 15 U.S.C. § 77a et. seq., (Securities Act of 1933) and 15 U.S.C. § 78a et. seq. (Securities Exchange Act of 1934), as amended.

21. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district.

NOVA, HARTLINE AND DIMARCANTONIO MADE ORAL
REPRESENTATIONS THAT THE PURCHASE OF NOVA
COMMON STOCK WAS CONDITIONED ON THE MERGER

22. In 2008, NOVA employed Keystone as the exclusive placement agent to raise capital for NOVA from members of the public through the sale of shares of NOVA's common stock in blocks of 5,000 shares at $11 per share pursuant to Rule 506 of Regulation D promulgated under the Securities Act of 1933 (the "Offering").

23. Keystone, Ballamor, NOVA's President, Hartline, NOVA's Chairman, DiMarcantonio, and NOVA's former Chairman, Bekkedam, all acted as NOVA's stock promoters to sell NOVA's common stock.

24. The Plaintiffs were interested in an investment in NOVA only if the planned merger between NOVA and Delaware Valley Financial Group ("DVFG") was consummated (the "Merger").

25. NOVA represented to Plaintiffs that the Merger would have dramatically increased the value and earnings of a combined NOVA/DVFG entity.

26. Plaintiffs are suing not because the Merger was never consummated, but because their money was to be held in an interest bearing escrow account until the NOVA/DVFG Merger closed. Despite the collapse of the Merger, and thus the impossibility of performance upon

which their investments were contingent, NOVA took the escrowed funds without Plaintiffs' consent.

27.     On or about April 17, 2009, to put the minds of the Plaintiffs at ease and to correct any ambiguities in the Offering Materials, NOVA sent a letter to the Plaintiffs addressed as "Dear <u>Potential</u> Shareholders." A true and correct copy of the April 17, 2009, NOVA letter to Plaintiffs is incorporated by reference and attached hereto as Exhibit "A."

28.     In the April 17, 2009, letter, NOVA reconfirmed what Hartline, DiMarcantonio and Bekkedam promised earlier: that the Plaintiffs funds would be held in escrow (i.e. that the offering would not close) until the Merger was complete. <u>See</u> Exhibit "A."

29.     The title of NOVA's letter is "NOVA Financial Holdings, Inc. (NOVA) and Delaware Valley Financial Group Inc. (DVFG) merger progress report." <u>See</u> Exhibit "A."

30.     In the letter, NOVA advised the Plaintiffs that NOVA "signed a Definitive Agreement on March 6, 2009, in which NOVA will acquire DVFG and DVFG will become an insurance and brokerage arm of NOVA." <u>See</u> Exhibit "A."

31.     NOVA further advised that "[i]n accordance with the Subscription Agreement signed by you as an investor, any funds delivered to NOVA in connection with <u>your potential</u> <u>**share purchase are being and will continue to be held**</u> in an interest bearing escrow account earning 1.0% <u>**until our merger closes**</u>." <u>See</u> Exhibit "A" (emphasis added).

32.     Under the terms of the Subscription Agreement executed by NOVA and each Investor in connection with the Offering, Keystone was required to deposit each plaintiff's subscription payments in an escrow account maintained at NOVA Bank. A true and correct copy of the Subscription Agreement is incorporated by reference and attached hereto as Exhibit "B."

33.     The Subscription Agreement referred to the escrow account as the "Keystone-NOVA Financial Escrow," which was to be controlled by Keystone. <u>See</u> Exhibit "B," p. A-1, ¶ B.

34.     The Subscription Agreement executed by the Plaintiffs and the Private Placement Memorandum (the "PPM") referenced therein (together, the "Offering Materials") provided that the offering terminated on August 29, 2008, subject to earlier termination or extension by NOVA for one or more 30-day periods after August 29, 2008. <u>See</u> Exhibit "A," p. A-2, ¶ D.  A true and correct copy of the PPM is incorporated by reference and attached hereto as Exhibit "C."

35.     Hartline, DiMarcantonio and Bekkedam personally and on behalf of NOVA solicited the Plaintiffs to purchase common stock in NOVA during a series of meetings, lunches and dinners that took place in 2008 and 2009.

36.     Hartline, DiMarcantonio and Bekkedam usually acted in concert and gave each of the Plaintiffs the impression that they collectively spoke for NOVA.

37.     Hartline, DiMarcantonio and Bekkedam told the Plaintiffs on many occasions in 2008 and 2009 that NOVA would use $2.8 million from the proceeds of the Offering for NOVA's pending merger with DVFG.

38.     Based on the repeated oral representation of NOVA through Hartline, DiMarcantonio and Bekkedam, NOVA represented that the Offering, at least as to Plaintiffs, was contingent on the Merger closing.

39.     Before each investor executed a Subscription Agreement, they were assured by Hartline, DiMarcantonio and Bekkedam that their investments would be contingent on the Merger closing.

40.     In fact, Plaintiff Schirmer sent a letter addressed to Brian Hartline, NOVA Financial Holdings, Inc., dated August 13, 2008, which stated:

> I will invest $165,000.00 via the NOVA Bank and Subscription Agreements attached.  A condition of this investment is that the funds are to be held in escrow as I do not intend to complete if NOVA fails to complete the acquisition of Delaware Valley Financial Group, Inc.

A true and correct copy of the August 13, 2008 letter is attached as Exhibit "D."

41.     Further, Plaintiff Bendokas sent a letter addressed to "Keystone Nova Financial," that was mailed to the address of Keystone, dated August 25, 2008, which stated:

> Please accept the enclosed check . . . in the amount of $55,000.00 for 5,000 shares at $11.00 per shares for the new offering.
> Please deposit check in escrow account and buy shares only at the close of the merger with DVFG.
> If the DVFG merger does not materialize, please refund the $55,000.00 to me at the above address.

A true and correct copy of the August 25, 2008 letter is attached as Exhibit "E."

42.     Additionally, Plaintiff Curry sent a letter dated September 24, 2008, addressed to Keystone Nova Financial, at the address of Keystone Equities Group, which enclosed a $55,000.00 check and stated in relevant part:

> Please deposit said amount in escrow and buy shares only at the close of the merger with Delaware Valley Financial Group (DVFG).
> In the event that the DVFG merger does not materialize, please refund the entire amount of $55,000.00 to the above referenced address.

A true and correct copy of the September 28, 2008 letter is attached as Exhibit "F."

43.     In 2008 and 2009, each plaintiff executed one or more Subscription Agreements with NOVA and provided funds to Keystone ranging from $55,000 to $350,000, each based on

representations by NOVA through Hartline, DiMarcantonio and Bekkedam that their investment was conditioned upon the closing of the Merger.

44.     The statements of NOVA, through Hartline, DiMarcantonio and Bekkedam were material inducements to each plaintiff's decision to invest.

45.     None of the Plaintiffs would have purchased shares in NOVA without the investment being conditioned upon the closing of the Merger.

46.     The statements NOVA, through Hartline, DiMarcantonio and Bekkedam were material inducements to each plaintiff's decision not to rescind their investment before the Offering was accepted by NOVA.

47.     Each of the Plaintiffs would have rescinded their investments before the close of the Offering that took place in or around September of 2009, if they had known the Merger was not going to take place.

THE DEFENDANTS WERE OBLIGATED TO RETURN THE
PLAINTIFFS' FUNDS WHEN THE OFFERING TERMINATED UNDER
THE EXPRESS TERMS OF THE SUBSCRIPTION AGREEMENT

48.     The Subscription Agreement expressly provided that any subscriptions received after the termination date of August 29, 2008 or received and not accepted prior to August 29, 2008 or a later date if the Offering was extended by NOVA in accordance with the Subscription Agreement, would be returned in full to the Plaintiffs.  See Exhibit "B," p. A-2, ¶ D.

49.     The Subscription Agreement expressly provided that the "Agreement is not binding upon the Company until the Company accepts it, which acceptance is at the sole discretion of the Company and is to be evidenced by the Company's execution of this Agreement."  See Exhibit "B," p. A-2, ¶ A.

50.     NOVA did not execute any of the Plaintiffs' subscriptions prior to August 28, 2008.

51.     None of the Plaintiffs' subscriptions were accepted prior to August 28, 2008.

52.     On page A-2 of the Subscription Agreement, NOVA and each plaintiff agreed that the closings with respect to the purchase of shares in NOVA would occur from time to time and, in any event, no later than five (5) business days after the end of the "Offering Period," or any extension thereof. See Exhibit "B," p. A-2, ¶ F.

53.     No closing of the Plaintiffs' purchase of Shares of NOVA happened prior to September 3, 2008.

54.     The Subscription Agreement provided that the "Offering Period" was "the earlier of (i) the date upon which the maximum numbers of Shares offered was sold; or (ii) August 29, 2008, subject to earlier termination or extension by the Company in its discretion." See Exhibit "B," p. A-2, ¶ D.

55.     Further, the Subscription Agreement provided that "any subscriptions received after the end of the Offering Period **or received but not accepted prior to the end of the Offering Period will be returned in full.**" See Exhibit "B," p. A-2, ¶ D (emphasis added).

56.     Moreover, the Subscription Agreement provided that "[a]ny subscription received but not accepted by the Company prior to the end of the Offering Period or received by the Company after the end of the Offering Period will be rejected by the Company." See Exhibit "B," p. A-3, ¶ C.

57.     The Subscription Agreement stated that no provisions in the agreements shall be "waived, modified, discharged or terminated except by an instrument in writing signed by the party against whom any waiver, modification, discharge or termination is sought." See Exhibit "B," p. A-9, ¶ G.

9

58.     The   Subscription   Agreement   provided   that   "[a]ll   notices   and   other communications provided for hereunder shall be in writing, and . . . shall be delivered or mailed by registered mail." See Exhibit "B," p. A-9, ¶ A.

59.     No Investor ever executed an instrument in writing to extend the August 29, 2008, offering period and/or modify any terms of the Subscription Agreement

60.     Neither NOVA nor Keystone ever sent amendments and/or updates of the Offering Materials to the Plaintiffs.

61.     Neither NOVA nor Keystone ever sent any notice to the Plaintiffs relating to any extension of the offering period.

62.     Upon information and belief, NOVA never exercised its right to extend the offerings by one or more 30-day periods.

63.     Since the Subscription Agreement was not modified and since neither NOVA nor Keystone sent any notice of extension of the offering period, the offering terminated and the Plaintiffs' funds should have been returned on or around August 29, 2008.

64.     However, Keystone and NOVA allege that they kept the offering open well past August 29, 2008, in direct contravention of the Subscription Agreement.

65.     During the period between the August 29, 2008 expiration of the Subscription Agreement, and September 2009 when the final Subscription Agreement was accepted by NOVA, NOVA made repeated false representations to Plaintiffs regarding NOVA's intent to complete the Merger in order to induce Plaintiffs to allow their money to remain in the Keystone escrow account.

66.     As of August 29, 2008, when the Subscription Agreement's offering period expired without an acceptance of the Plaintiffs' Subscription Agreements, or at the very latest

September 3, 2008 (because no closing of the purchase and sale of shares had occurred within 5 days of the end of the offering period), the Plaintiffs' ability to recover their money was not affected by the Subscription Agreement or PPM.

67.     The irrevocability provisions of the Subscription Agreement and PPM were no longer of any force and effect as of August 29, 2008, or at the very latest, September 3, 2008.

68.     In order to prevent the Plaintiffs from demanding the return of their money to purchase shares of NOVA after the offering period expired, and while Defendants continued to exercise control over the Plaintiffs' money, Defendants made numerous false statements to the Plaintiffs.

69.     The Offering purportedly closed in September 2009, when either NOVA seized the Plaintiffs' funds being held in escrow or Keystone released the Plaintiffs' funds to NOVA from escrow.  This was approximately a year and four months after the start of the Offering.

70.     NOVA failed to receive the Plaintiffs' approval for the modification of the terms of the Offering and failed to notify the Plaintiffs of the material change in the terms of the Offering, that the closing date had been substantially modified.

71.     Even though the PPM was ambiguous as to whether the Offering was contingent on the Merger, Hartline, DiMarcantonio and Bekkedam unabashedly represented to Plaintiffs from the inception of the Offering that the Plaintiffs' funds would be returned and the Offering terminated if the Merger did not happen.

CONTINUED MATERIAL MISREPRESENTATIONS
THAT INVESTMENT FUNDS WERE BEING HELD IN
ESCROW UNTIL THE MERGER CLOSES

72.     In 2008 and early 2009, the Plaintiffs made periodic inquiries as to the status of the NOVA/DVFG Merger, and were advised that the Merger was not yet approved, but that their money was safe in an interest-bearing escrow account.

73.     Despite the ambiguity in the Offering Materials regarding whether the offering was contingent on the Merger, NOVA, through the use of Hartline, DiMarcantonio and Bekkedam, continually made oral representations that the Investor funds would not be taken until the NOVA/DVFG Merger closes and would be returned if the Merger did not close.

74.     Prior to April 17, 2009, Hartline, DiMarcantonio and Bekkedam met with Plaintiffs to reassure them that their money was safe in an interest-bearing escrow account pending the NOVA/DVFG Merger.

75.     In furtherance of their scheme to defraud the Plaintiffs, on or about April 17, 2009, to put the minds of the Plaintiffs at ease and to correct any ambiguities in the Offering Materials, NOVA sent a letter to the Plaintiffs addressed as "Dear Potential Shareholders." This letter was written more than eight (8) months after the first Plaintiff, as a "Potential Shareholder" signed the Subscription Agreement and deposited his funds into escrow. See Exhibit "A."

76.     In the April 17, 2009, letter, NOVA reconfirmed what Hartline, DiMarcantonio and Bekkedam promised earlier: that the Plaintiffs' funds would be held in escrow (i.e. that the Offering would not close) until the Merger was complete. See Exhibit "A."

77.     The title of NOVA's letter is "NOVA Financial Holdings, Inc. (NOVA) and Delaware Valley Financial Group Inc. (DVFG) merger progress report." See Exhibit "A."

78.    In the letter, NOVA advised the Plaintiffs that NOVA "signed a Definitive Agreement on March 6, 2009, in which NOVA will acquire DVFG and DVFG will become an insurance and brokerage arm of NOVA." See Exhibit "A."

79.    NOVA further advised that "[i]n accordance with the Subscription Agreement signed by you as an investor, any funds delivered to NOVA in connection with your potential **share purchase are being and will continue to be held** in an interest bearing escrow account earning 1.0% **until our merger closes**." See Exhibit "A" (emphasis added).

80.    NOVA's letter comports with its continued oral assertions to the Plaintiffs stating unmistakably that the Plaintiffs money would be returned and the subscription would not close if the Merger did not happen.

81.    The letter was not identified as containing forward looking statements and did not contain the appropriate cautionary statements to allow the application of safe harbor protection of the statements.

82.    The subject letter was written almost a year after the beginning of the Offering in June of 2008, and well beyond the contractually agreed upon closing date of August 29, 2008. The only reason each Investor kept their money in escrow with Keystone was because of assertions such as those in the April 17, 2009 letter, that the money would not be released by Keystone or taken by NOVA unless and until the NOVA/DVFG Merger closed.

83.    By September, 2009, the Merger still had not closed.

84.    Defendants' fraudulent statements are not protected by the safe harbor provisions for forward looking statements because the statements were not identified as forward looking statements and were not accompanied by the appropriate cautionary statements.

DEFENDANTS NEEDED THE PLAINTIFF'S CAPITAL
TO COVER UP THE INVOLVEMENT OF CERTAIN
CURRENT AND FORMER NOVA OFFICERS, INCLUDING
DIMARCANTONIO AND BEKKEDAM, IN ILLEGAL SELF
DEALING BETWEEN THE INDIVIDUALS AND NOVA

85.     DiMarcantonio, aided by Bekkedam, engaged in self-dealing in violation of federal and state banking regulations when DiMarcantonio orchestrated NOVA Bank's loans on behalf of entities owned and controlled by DiMarcantonio and Bekkedam including DV Premium Finance I and DV Premium Finance II (collectively "DV Premium").

86.     DiMarcantonio received substantial kickbacks as a result of loans made to or for the benefit of the entities owned and controlled by him, including a 7% commission on transactions involving NOVA Bank loans to DV Premium.

87.     DiMarcantonio and Bekkedam personally benefited through their fraudulent conduct because the infusion of the Plaintiffs' capital helped DiMarcantonio and/or Bekkedam to retain the kickbacks.

88.     The self-dealing of DiMarcantonio and Bekkedam caused NOVA Bank to suffer approximately $20 million in losses.

89.     In an effort to cover-up NOVA Bank's losses caused by the self-dealings of DiMarcantonio and Bekkedam, and especially in light of the increasing federal oversight of NOVA Bank's operations, Defendants conspired to release the Plaintiffs'' funds from the Keystone-controlled escrow account.

RELEASE OF MONEY FROM ESCROW DESPITE
FAILED MERGER AND NO CHANGE IN OFFERING TERMS

90.     In desperate need of money to bolster reserves under pressure from bank regulators, but still unable to finalize the Merger, NOVA was determined to eliminate the

condition that the funds be kept in an interest-bearing escrow account until the NOVA/DVFG Merger closed.

91.    NOVA, through Hartline, DiMarcantonio and Bekkedam, called for another meeting with the Plaintiffs to be held at DVFG's office in Conshohocken, PA.  Hartline, DiMarcantonio and Bekkedam appeared at the meeting on September 21, 2009, in order to convince the Plaintiffs to allow NOVA to use the funds being held in escrow, despite the fact that the Merger was not yet closed.

92.    At the meeting, Bekkedam bragged that he previously raised over $40 million for NOVA and had access to literally billions of dollars in more capital, personally or through his numerous friends and clients in the ultra high net worth world.

93.    Bekkedam expressly stated to the Plaintiffs during the September 21, 2009 meeting that he would personally ensure that each plaintiff received back their money with interest if the Merger did not close.

94.    Up until this point, the Plaintiffs' money was still being held in an interest-bearing escrow account and the Plaintiffs had the right to demand the return of their money.

95.    DiMarcantonio attended the meeting with Bekkedam and was present when Bekkedam made his representations on behalf of NOVA.

96.    Defendants' fraudulent statements at the September 21, 2009 meeting are not protected by the safe harbor provisions for forward looking statements because the statements were not identified as forward looking statements and were not accompanied by the appropriate cautionary statements.

97.    On September 24, 2009, after substantial delays in the Merger and desperately in need of a capital infusion for NOVA, following the meeting, Bekkedam wrote a letter to the

Plaintiffs, dated September 24, 2009, attached hereto as Exhibit "G," in which he dramatically changed his position on the contingent nature of the offering:

> Should the closing with DVFG not occur prior to 3/31/10, we will commit to seeking Investors who will replace your capital should you not want to remain an investor. Given the capital already invested and committed via Ballamor clients and relationships and the bank's "well capitalized" financial condition, we do not anticipate this being a problem.

See Exhibit "G."

98.     Defendants' fraudulent statements in the September 29, 2009 letter are not protected by the safe harbor provisions for forward looking statements because the statements were not identified as forward looking statements and were not accompanied by the appropriate cautionary statements.

99.     As of September 24, 2009, the Defendants had not provided any formal notice that the offering had been extended and the Plaintiffs had not executed any instrument in writing either extending the offering or modifying the terms of the offering.

100.    Upon information and belief, NOVA never extended the offer past the August 29, 2008 termination date.

101.    Despite never having extended the offering past the August 29, 2008 termination date, and despite the language in the PPM that all Subscription Agreements received after that date were rejected after August 29, 2008, NOVA continued to collect agreed Subscription Agreements and deposited Plaintiffs' funds into an interest-bearing escrow account.

102.    NOVA represented and the Plaintiffs believed that Bekkedam was a director or "owner" of NOVA (because he controlled NOVA through a controlling interest of shares held by clients of Ballamor) and was acting at the direction of NOVA when Bekkedam agreed to return the Plaintiffs' money if the Merger did not close by March 31, 2010.

16

103.    Bekkedam's authority on behalf of NOVA was affirmed by Hartline during the numerous meetings with potential investors and by Bekkedam's representations such as when he stated in the September 24, 2009, letter that "NOVA was also granted TARP of $13.5 million which is inexpensive capital we can utilize but will not hesitate to pay off should regulatory pressure associated with it become difficult." See Exhibit "G" (emphasis added).

104.    Despite the representations of repurchase, each of the Defendants knew that under no condition would any of the Plaintiffs agree to release the funds from escrow without the completion of the Merger.

105.    Upon information and belief, to meet NOVA Bank's capital requirements for the 3rd Quarter 2009 reporting period the Plaintiffs' money was released from escrow to NOVA sometime after the September 24, 2009 letter.

106.    Upon information and belief, after NOVA took Plaintiffs' funds from escrow, they invested those funds in NOVA Bank to provide a capital infusion to NOVA Bank.

107.    Using Plaintiffs' funds to inflate NOVA Bank's capital was done, in part, to hide the losses that resulted from the self-dealing loans that NOVA Bank provided to companies owned and controlled by DiMarcantonio and Bekkedam, including DV Premium.

108.    The Plaintiffs were issued stock certificates sometime in November, 2009.

109.    The Merger never closed.

110.    The Plaintiffs were issued stock certificates despite that the offering period closed on August 29, 2008 and NOVA Financial Holdings, Inc. never accepted any of Plaintiffs' Subscription Agreements.

111.    The Plaintiffs would have demanded a return of their money from Defendants after the expiration of the Subscription Agreement on August 29, 2008, but for Defendants'

fraudulent statements that the Plaintiffs' money was being held in escrow pending the DVFG/NOVA merger.

### THE PLAINTIFFS TRIED UNSUCCESSFULLY TO GET NOVA, BALLAMOR AND BEKKEDAM TO HONOR THEIR PROMISES

112.    In early 2010, the Plaintiffs made inquiry of NOVA as why their funds were released from escrow without the NOVA/DVFG merger ever closing.

113.    NOVA refused to return the Plaintiffs' funds or to repurchase the Plaintiffs' shares.

114.    In early 2010, the Plaintiffs made inquiry of Ballamor and Bekkedam and confronted Bekkedam and Hartline in a meeting about Bekkedam's promise to purchase back their shares.

115.    Bekkedam's financial and business circumstances took a severe reversal after it came to light that Bekkedam recommended investing in a ponzi scheme in Florida to many of his customers.

116.    Bekkedam soon closed Ballamor, attempted to sell his customer list to a third party and moved to Florida.

117.    Bekkedam refused to repurchase the Plaintiffs' shares.

118.    Throughout 2010, the Plaintiffs made repeated demands upon NOVA through Hartline to return their funds or repurchase their shares and those demands were likewise refused.

119.    By mid-2010, despite the release of the Plaintiffs' money, NOVA Bank was still undercapitalized and came under the increased scrutiny of federal regulators.

120.    NOVA Bank's capital problems culminated in the execution of a Consent Order with the Federal Deposit Insurance Corporation on May 7, 2010 and an agreement with the Federal Reserve Bank on July 19, 2010.

121.    The value of the investment, which the Plaintiffs never intended to make in the first place without the completion of the NOVA/DVFG Merger, plunged to a fraction of its value.

## COUNT ONE

### FRAUD IN CONNECTION WITH THE PURCHASE OR SALE OF SECURITIES
**Violations of Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5] (Against NOVA, Hartline, DiMarcantonio, Ballamor and Bekkedam)**

122.    The Plaintiffs incorporate the allegations asserted in the above paragraphs as if the same were set forth herein at length.

123.    Defendants, and each of them, by engaging in the conduct described above, directly and indirectly, singly and in concert, knowingly and/or recklessly, by use of the means or instruments of transportation or communication in, and the means or instrumentalities of, interstate commerce, or by use of the mails, in the offer or sale, and in connection with the purchase or sale, of securities, have: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of, or otherwise made untrue statements of material fact, or omitted to state material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, acts, practices and courses of business which operated or would operate as a fraud or deceit upon the Plaintiffs.

124.    Defendants, acting on behalf of and at the insistence of NOVA, knew, or were reckless in not knowing, that these material representations were false or misleading.

125.    Defendants' misrepresentations and omissions were material.

126.    By reason of the actions alleged herein, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

WHEREFORE, the Plaintiffs respectfully request this Court enter judgment in their favor and against Defendants, jointly and severally, in an amount to be determined plus interest, attorney fees, punitive damages, expenses of suit, and such other and further relief as this Court deems just and proper.

## COUNT TWO

### FRAUDULENT OR NEGLIGENT MISREPRESENTATION
### (Against NOVA, Hartline, DiMarcantonio, Ballamor and Bekkedam)

127.    The Plaintiffs incorporate by reference all of the preceding paragraphs as if fully set forth herein at length.

128.    The Defendants' asserted material misrepresentations and omissions of material fact in connection with the Merger, the length of the Offering, the extension of the Offering and the investment of the Plaintiffs' monies.

129.    The Defendants made material misrepresentations and omissions of material fact with the intent of deceiving and defrauding the Plaintiffs.

130.    In the alternative, the Defendants acted negligently and/or recklessly and failed to exercise reasonable care in making the  misrepresentations of material fact.

131.    These misstatements and omissions of material facts were made by the Defendants and with the intent that the Plaintiffs would rely upon them.

132.    As part, and in furtherance, of this violative conduct, NOVA, Hartline and DiMarcantonio made the misrepresentations alleged above.

133.    As part, and in furtherance, of this violative conduct, Ballamor and Bekkedam made the misrepresentations alleged above.

134.    Among other things, NOVA and Hartline represented that "[i]n accordance with the Subscription Agreement signed by you as an investor, any funds delivered to NOVA in connection with your potential share purchase are being and will continue to be held in an interest bearing escrow account earning 1.0% until our merger closes." See Exhibit "G" (emphasis added).

135.    NOVA, Hartline, DiMarcantonio, Ballamor and Bekkedam further represented that if the Merger did not close, the Plaintiffs' funds would be returned, misrepresented the length of the Offering, failed to terminate the Offering pursuant to their oral assertions and the Offering Materials and modified the Offering without the express written consent of the Plaintiffs.

136.    Representations were made before and after Plaintiffs entered into their subscription agreements, and made for improper purpose of inducing Plaintiffs not to withdraw funds being held in escrow.

137.    Each of NOVA, Hartline, DiMarcantonio, Ballamor and Bekkedam's representations were in fact false, as NOVA had every intention of using the monies regardless of whether the NOVA/DVFG Merger was completed and regardless of their oral assertions and/or their obligations under the Offering Materials.

138.    Each of the Defendants knew or should have know that their statements were false when made.

139.    These representations were made by NOVA, Hartline, DiMarcantonio, Ballamor and Bekkedam with the intent of defrauding and deceiving the Plaintiffs and were made with the intent of inducing the Plaintiffs not to withdraw their funds from the Offering if the Merger did not happen.

140.   At the time said representations were made by NOVA, through Hartline, DiMarcantonio and Bekkedam, and at the time the Plaintiffs reasonably relied on such statements in deciding not to rescind their subscriptions or to demand the immediate release of their money held in escrow, the Plaintiffs were unaware of the falsity of said representations and reasonably believed them to be true.

141.   The Plaintiffs did not know, and through the exercise of reasonable diligence could not have known of defendants' fraud until at least November, 2009, after the Plaintiffs' funds were illegally released from escrow and shares of NOVA were issued to the Plaintiffs.

142.   In justifiable reliance upon said representations, the Plaintiffs were induced not to rescind their subscriptions or to demand the immediate return of their money held in escrow and, as a result, suffer injuries, including the substantial loss of each Plaintiffs' investment due to the devaluation of NOVA.

143.   As a direct and proximate result of NOVA, Hartline, DiMarcantonio, Ballamor and Bekkedam's fraudulent concealment of the financial condition of NOVA and misrepresentations that the Offering was conditioned on the completion of the Merger, the Plaintiffs suffered harm, damages, and economic loss.

144.   NOVA, Hartline, DiMarcantonio, Ballamor and Bekkedam's actions and omissions as alleged in this Complaint constitute willful and deliberate oppression, fraud, wantonness, and/or malice with respect to the Plaintiffs, so as to warrant the imposition of punitive damages.

WHEREFORE, the Plaintiffs respectfully request this Court enter judgment in their favor and against NOVA, Hartline, DiMarcantonio, Ballamor and Bekkedam, jointly and severally, in

an amount to be determined, plus interest, attorney fees, punitive damages, expenses, and such other and further relief as this Court deems just and proper.

## COUNT THREE

### Pennsylvania Securities Act of 1972 Part IV Section 1-401 Sales and Purchases (Against NOVA, Hartline, DiMarcantonio, Ballamor and Bekkedam)

145.    The Plaintiffs incorporate the allegations asserted in the above paragraphs as if the same were set forth herein at length.

146.    NOVA, Hartline, DiMarcantonio Ballamor and Bekkedam, directly or indirectly, used or employed, in connection with the purchase or sale of NOVA's securities, manipulative or deceptive devices or contrivances, and made untrue statements of material fact and omitted to state material facts necessary to make statements made, in light of the circumstances in which they were made, not misleading, and engaged in acts and practices that operate as a fraud and a deceit, in contravention of Pennsylvania law.

147.    Without limitation, NOVA, Hartline, DiMarcantonio, Ballamor and Bekkedam, as alleged above:

        A.    employed a device, scheme, or artifice to defraud;

        B.    made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, and

        C.    engaged in acts, practices, and courses of business that operated or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

148.    NOVA, Hartline, DiMarcantonio, Ballamor and Bekkedam's misrepresentations and omissions, as detailed above, were material.

23

149.     The Plaintiffs reasonably relied on those misrepresentations and omissions.

150.     The Plaintiffs were damaged by the conduct of NOVA, Hartline, DiMarcantonio, Ballamor and Bekkedam.

151.     As a result of these violations, NOVA, Hartline, DiMarcantonio, Ballamor and Bekkedam, and each of them, are jointly and severally liable to the Plaintiffs pursuant to the Pennsylvania Act.

WHEREFORE, the Plaintiffs respectfully request this Court enter judgment in their favor and against NOVA, Hartline, DiMarcantonio, Ballamor and Bekkedam, jointly and severally, in an amount to be determined, plus interest, attorney fees, expenses, and such other and further relief as this Court deems just and proper.

## COUNT FOUR

### Control Person Liability Under Sec. 20(a) of the Exchange Act
### (Against NOVA and Ballamor)

152.     The Plaintiffs incorporate the allegations asserted in the above paragraphs as if the same were set forth herein at length.

153.     NOVA and Ballamor, at the time of the misrepresentations herein alleged, were "persons" who, directly or indirectly, controlled Hartline, DiMarcantonio and Bekkedam who made primary violations of Sections 10(b) of the Exchange Act and Rule 10b-5 promulgated there under.

154.     By virtue of their participation in and/or awareness of Hartline, DiMarcantonio and Bekkedam's actions and/or intimate knowledge of the misrepresentations made to the Plaintiffs by Hartline, DiMarcantonio and Bekkedam, NOVA and Ballamor had the power to influence and control and did influence and control, directly or indirectly, the decision-making of Hartline, DiMarcantonio and Bekkedam, including the false and misleading statements to the

Plaintiffs designed to induce the Plaintiffs to release funds from escrow to which NOVA otherwise had no right and/or to refrain from demanding the immediate return of the Plaintiffs' funds held in escrow.

155.    In particular, both NOVA and Ballamor had direct and supervisory involvement in the day-to-day operations of Hartline, DiMarcantonio and Bekkedam and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

156.    NOVA and Ballamor aided and abetted, provided substantial assistance to and were, in a meaningful sense, culpable participants in Hartline, DiMarcantonio and Bekkedam's violations.

157.    The culpable participation of NOVA and Ballamor included, but was not limited to, both individually and in concert with Hartline, DiMarcantonio and Bekkedam, misrepresenting that the Offering would not close unless the Merger closed, refusing to return funds to Plaintiffs when the Offering expired by its terms, accepting money from Plaintiffs after the Offering expire purporting to extend the Offering without providing notification in accordance with the Offering Documents and materially modifying the terms of the Offering without express authorization from each Investor.

158.    By reason of the conduct alleged herein above, NOVA and Ballamor are liable for the conduct of Hartline, DiMarcantonio and Bekkedam under Section 20a of the Securities Exchange Act of 1934.

159.    As a direct and proximate result of NOVA, Hartline, DiMarcantonio, Bekkedam and Ballamor's wrongful conduct, the Plaintiffs suffered substantial damages.

WHEREFORE, the Plaintiffs respectfully request this Court to enter judgment in their favor and against NOVA and Ballamor jointly and severally in an amount to be determined plus interest, punitive damages, expenses, and such other and further relief as this Court deems just and proper.

## COUNT FIVE

### The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL") (Against Nova, Keystone, Ballamor, Bekkedam, Hartline and DiMarcantonio)

160.    The Plaintiffs incorporate the allegations asserted in the above paragraphs as if the same were set forth herein at length.

161.    The UTPCPL provides that: "any person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss . . . as a result of the use or employment by any person of a method, act or practice declared unlawful by section 3 of this act."

162.    The Plaintiffs were purchasers of securities for personal purposes within the meaning of 73 Pa.C.S.A. §§ 201-9.2.

163.    Defendants used and employed unfair or deceptive acts or practices within the meaning of the UTPCPL as described in detail above.

164.    Defendants' actions as set forth above constitute unfair or deceptive practices under the UTPCPL, which unfair or deceptive acts or practices had the effect of creating confusion and misunderstanding on the part of the Plaintiffs.

165.    Defendants' actions as set forth above occurred in connection with the sale of under the UTPCPL.

166.    Each Defendant either directly and/or by their acquiescence committed unfair and deceptive acts and practices against the Plaintiffs.

167.    As a result of Defendants' conduct, the Plaintiffs sustained substantial damages because the Plaintiffs were tricked into making an investment to which they never agreed or wanted.

168.    The Plaintiffs are entitled to an award of attorneys fees, penalties and treble damages pursuant to 73 P.S. §201-9.2

WHEREFORE, the Plaintiffs demand that judgment be entered in their favor and against Defendants, jointly and severally, for compensatory damages, together with interest, penalties, treble damages, costs of suit, counsel fees and such other relief as this Court deems just, proper.

## COUNT SIX

### BREACH OF CONTRACT
### (Against NOVA and Keystone)

169.    The Plaintiffs incorporate the allegations asserted in the above paragraphs as if the same were set forth herein at length.

170.    In connection with the Offering, NOVA and Keystone entered into a Subscription Agreement with each Plaintiff.

171.    Keystone acted as the exclusive placement agent for the Offering.

172.    Under the terms of the Subscription Agreement, each Plaintiffs' funds would be held in an escrow account controlled by Keystone and returned at the end of the Offering Period if the subscriptions were not accepted by NOVA and/or a closing did not take place within five (5) days of the end of the Offering Period of August 29, 2008, subject to earlier termination or extension by NOVA.

173.    As the escrow agent in control of Plaintiffs' money, Keystone owed a duty to Plaintiffs not to release funds from escrow unless all of the terms of their Offering were complete and to return Plaintiffs' fund to Plaintiffs if the Offering was not completed or if it terminated.

174.    Keystone was either directly liable to the Plaintiffs under the Subscription Agreement or the Plaintiffs are intended third-party beneficiaries of the agreement appointing Keystone as the exclusive placement agent for the Offering and escrow agent for Plaintiffs' funds held in escrow.

175.    Under the terms of the Subscription Agreement, the provisions of that agreement could not be "waived, modified, discharged or terminated except by an instrument in writing signed by the party against whom any waiver, modification, discharge or termination is sought." See Exhibit "B."

176.    None of the Plaintiffs executed an instrument in writing to modify any terms of the Subscription Agreement.

177.    Keystone and NOVA never advised the Plaintiffs that the Offering Period was extended; the Plaintiffs never signed any writing agreeing to any such extension; and reconfirmation offers were never sent to the Plaintiffs.

178.    Thus, by August 29, 2008, since the Offering Period had not been extended in accordance with the Subscription Agreement, the Offering should have expired by its terms and Keystone and NOVA were obligated to return the Plaintiffs' funds, but failed or refused to do so.

179.    Keystone failed to return the funds held in escrow back to the Plaintiffs, in direct violation of its obligations under the Subscription Agreement.

180.    Keystone and NOVA breached their respective obligations under the Offering Materials by, among other things, not terminating the Offering after August 28, 2009, since the period for the offering had not been extended, not returning the Plaintiffs' funds and not notifying the Plaintiffs in accordance with the Subscription Agreement that the offering period had been extended

181.    The Plaintiffs have at all times complied with their contractual obligations under the Subscription Agreement.

182.    As a direct and proximate result of the above contractual breaches, the Plaintiffs have sustained damages in the amount of their respective subscription payments.

WHEREFORE, the Plaintiffs respectfully request this Court to enter judgment in their favor and against Keystone and NOVA, jointly and severally, in an amount to be determined at trial plus interest, expenses, and such other and further relief as this Court deems just and proper.

## COUNT SEVEN

### UNJUST ENRICHMENT
### (Against NOVA Bank)

183.    The Plaintiffs incorporate the allegations asserted in the above paragraphs as if the same were set forth herein at length.

184.    The Plaintiffs invested in NOVA on the express condition that the NOVA/DVFG Merger be completed.

185.    NOVA knew and acknowledged that this was the only reason the Plaintiffs agreed to execute the Subscription Agreement and to deliver the subscription payment to Keystone for the purpose of holding those funds in escrow pending the completion of the Merger.

186.    NOVA confirmed the contingent nature of the putative investment on April 17, 2009, when it sent a letter to the "Potential Shareholders" reassuring them that "[i]n accordance with the Subscription Agreement signed by you as an investor, any funds delivered to NOVA in connection with your potential share purchase are being and will continue to be held in an interest bearing escrow account earning 1.0% **until our merger closes**." See Exhibit "A" (emphasis added).

187.    The Plaintiffs are shareholders of NOVA without the condition of their investment ever having been satisfied.

188.    NOVA gained access to and the benefit of the Plaintiffs' funds for which it knew were only intended for use in the event of a successful Merger.

189.    NOVA then invested the Plaintiffs' funds in NOVA Bank to falsely inflate the capital of NOVA Bank to meet various regulatory requirements.

190.    The Plaintiffs demanded a return of their funds when they learned that the Merger failed to be achieved.

191.    NOVA and NOVA Bank have wrongfully refused to give the Plaintiffs their money back.  The retention of such monies as a capital infusion to NOVA Bank under the circumstances described above would be unjust and inequitable.

192.    WHEREFORE, the Plaintiffs respectfully request this Court to enter judgment in its favor and against Defendant NOVA Bank in an amount to be determined at trial, interest, expenses, and such other and further relief as this Court deems just and proper.

## COUNT EIGHT

## CIVIL CONSPIRACY
### (Against All Defendants)

193.    The Plaintiffs incorporate the allegations asserted in the above paragraphs as if the same were set forth herein at length.

194.    NOVA Bank, Hartline, DiMarcantonio, Bekkedam, Ballamor and Keystone and others combined with a common purpose to do an unlawful act by unlawful means and for an unlawful purpose.

195.    Each of NOVA Bank, Hartline, DiMarcantonio, Bekkedam, Ballamor and Keystone performed an overt act in furtherance of that common purpose.

196.    The aforementioned combination and the acts performed thereby were the proximate cause of injuries suffered by the Plaintiffs, including without limitation: the funds withheld by Defendants after the termination of the Offering, the use of funds left in escrow with Keystone based upon the false representations of Defendants and the release of escrowed funds deposited with Keystone "to be held in and interest bearing escrow account earning 1.0% until our merger closes."

197.    In addition, the conduct by NOVA Bank, Hartline, DiMarcantonio, Bekkedam, Ballamor and Keystone listed above and recounted throughout this Complaint was outrageous, intentional, and malicious, as well as recklessly indifferent to the requirements of law and the rights of the Plaintiffs thereunder.

WHEREFORE, the Plaintiffs respectfully request this Court enter judgment in their favor and against Defendants, jointly and severally, in an amount to be determined, plus interest, attorney fees, punitive damages, expenses, and such other and further relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury of twelve on all triable issues.

ECKERT SEAMANS CHERIN & MELLOTT, LLC

*/s/ Keith E. Smith*
Keith E. Smith, Esquire
Ryan N. Boland, Esquire
Two Liberty Place
50 South 16th Street, 22nd Floor
Philadelphia, PA 19102
(215) 851-8400 (phone)
(215) 851-8383 (fax)

Attorneys for Plaintiffs,

Dated: November 4, 2011.

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| HERBERT WEISS, JOHN BENDOKAS, | : | |
| MARIA CACIA, DONALD CURRY, | : | |
| BRIGHTON MANAGEMENT GROUP, | : | CIVIL ACTION |
| LLC, THEODORE KILKUSKIE, ALBERT | : | |
| NEIBERG, GEORGE RYMAR, JOSEPH | : | |
| SCHIRMER, and  D.W.M. | : | |
| INCORPORATED., | | |
|     Plaintiffs, | : | No. 2:11-cv-5336-EL |
| | : | |
| | : | |
|         v. | : | |
| | : | |
| NOVA FINANCIAL HOLDINGS, INC., | : | |
| NOVA BANK, THE KEYSTONE | : | |
| EQUITIES GROUP, BALLAMOR | : | |
| CAPITAL MANAGEMENT, BARRY | : | |
| BEKKEDAM, BRIAN M. HARTLINE, and | : | |
| EDWARD J. DIMARCANTONIO, | : | |
|     Defendants. | : | |
| | : | |

## CERTIFICATE OF SERVICE

I certify that I caused a true and correct copy of the foregoing Amended Complaint to be

served via the ECF/CM system upon the following parties:

Michael Menkowitz, Esquire
Josuha Horn, Esquire
Amit Shah, Esquire
Fox Rothchild LLP
2000 Market Street, Twentieth Floor
Philadelphia, PA  19103

*Attorneys for Defendants*
*Nova Financial Holdings, Inc.*
*Nova Bank, The Keystone Equities Group*
*Edward J. DiMarcantonio and*
*Brian M. Hartline*

Matthew A. Taylor, Esquire
Ryan E. Borneman, Esquire
Duane Morris LLP
30 South 17th Street
Philadelphia, PA  19103

*Attorneys for Defendants*
*Ballamor Capital Management and*
*Barry R.  Bekkedam*

/s/Ryan N. Boland
Ryan N. Boland, Esquire